1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION


UNITED STATES OF AMERICA          .    Criminal Case No. RWT-10-0654
                                  .
    v.                            .
                                  .    Greenbelt, Maryland
FRANESIOUR B. KEMACHE-WEBSTER,.
                                  .
               Defendant.         .    Friday, August 5, 2011
. . . . . . . . . . . . . . . . .      9:15 a.m.


TRANSCRIPT OF MOTIONS HEARING AND SENTENCING
BEFORE THE HONORABLE ROGER W. TITUS
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          LISAMARIE FREITAS, ESQ.
                             United States Department of Justice
                             1400 New York Avenue, N.W., Suite 600
                             Washington, D.C. 20005

                             STACY DAWSON BELF, ESQ.
                             Office of the United States Attorney
                             U.S. Courthouse, Suite 400
                             6500 Cherrywood Lane
                             Greenbelt, Maryland 20770


FOR THE DEFENDANT:           GARY E. PROCTOR, ESQ.
                             8 E. Mulberry Street
                             Baltimore, Maryland 21202

                             GWENDOLYN R. WATERS, ESQ.
                             Lawlor and Englert, LLC
                             6305 Ivy Lane, Suite 608
                             Greenbelt, Maryland 20770


OFFICIAL COURT REPORTER:  GLORIA I. WILLIAMS   (301) 344-3228
          COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES

1                    P R O C E E D I N G S

2              MS. FREITAS:  Your Honor, we're here for the case of

3    United States v. Bryan Webster, criminal number RWT-10-0654.

4    Good morning.  LisaMarie Freitas and Stacy Belf for the

5    government, and also Postal Inspector Kai Pickens.

6              MR. PROCTOR:  Good morning, Your Honor.  Gary Proctor

7    and Gwendolyn Waters for Mr. Webster, who is present seated at

8    counsel table.

9              THE COURT:  Good morning.  All right.  We are here for

10   hearing on motions and, if appropriate, sentencing and I'll be

11   glad to hear your motions, Mr. Proctor.

12             MR. PROCTOR:  Yes.  Actually the motion for new trial

13   is my client's motion, Judge.  I have read it.  Frankly, I'm

14   unable to adopt it.  So, to the extent any argument is

15   necessary, I believe the court would have to hear from

16   Mr. Webster.

17             THE COURT:  Would Mr. Webster like to address the

18   court?

19             THE DEFENDANT:  Yes, Your Honor.

20             (Counsel confers with defendant off the record.)

21             MR. PROCTOR:  I'm sorry, Judge.  I've just explained to

22   Mr. Webster this is not allocution before sentencing.  That'll

23   come later.  It's if you believe you're entitled to a new

24   trial --

25             THE COURT:  Mr. Kemache-Webster, your attorney has

1   advised me that with regard to the motions that you have filed

2   that he as an officer of the court and in good conscience does

3   not believe there's a good basis for it.  It's very similar to

4   what happens in an appeal.  When attorneys are asked by a client

5   on appeal to file a brief raising issues that the attorney does

6   not feel are meritorious, it is called an Anders brief in which

7   they can simply advise the court that this is what he contends.

8            Now, I've got in front of me what you contend.  Your

9   counsel does not believe in good conscience as an officer of the

10  court he can advance arguments in favor of it.  I won't preclude

11  you, however, if you wish to make arguments in support of your

12  motion.

13           THE DEFENDANT:  Yes, I'd like to argue.

14           THE COURT:  I can't hear you, sir.  You have to speak

15  up.

16           THE DEFENDANT:  Yes, I'd like to argue it.

17           MR. PROCTOR:  Go ahead.

18           THE COURT:  Tell me what arguments you'd like to make

19  in support of your motions for a new trial.

20           THE DEFENDANT:  Oh, well, when we started trial, I

21  guess you call it the voir dire, when they was selecting jury, I

22  didn't select the people that was available.  They did.  And so,

23  my -- the sheet I have is blank, you know.  So, I didn't know

24  who was the people or the persons, and then by the time the jury

25  was selected, it was 12 women and two men, you know, and by the

1  case being a case with my daughter and my ex-wife, which was a

2  female case, I didn't think that was fair or evenly suggested.

3        Now, the government mentioned something about the

4  attorney had withdrew four white males but, like I said, I

5  didn't even know that he withdrew four white males because I

6  didn't even have that viewing sheet or the viewing opportunity.

7  The one I have is blank.  So I didn't even know what he was

8  doing, nor did he explain it to me.  And then as the process was

9  going on, I'm realizing, okay, there's 12 women, 10 black women,

10 two white women, one black male and one Asian male, and that

11 just didn't seem fair.  The government contends that, you know,

12 that that --

13       THE COURT:  Well, Mr. Kemache-Webster no objection was

14 made to the composition of the jury when the jury was seated.

15 An opportunity was given to object.

16       THE DEFENDANT:  I had objected to the attorney.  I

17 mean, I couldn't say nothing to you.

18       THE COURT:  I presided over the selection process and I

19 found no cause to find any suggestion that there should be a

20 Batson inquiry made with respect to the composition of the jury.

21 It was a product of normal jury selection process.

22       You're not entitled to a jury that's exactly balanced

23 between men and women or black and white or anything like that.

24 You're entitled to a jury that's fairly selected, and the jury

25 process in this case was fairly selected and no objection was

5

1    made to it.  So your objection is overruled.  Your motion is

2    denied with respect to that aspect.  Anything else?

3         THE DEFENDANT:  Then there was the issue with

4    confrontation.  I understand that -- well, my daughter wasn't

5    here.  But the government had said that I was supposed to

6    subpoena her if she wasn't here or to that effect.  But my

7    understanding was there couldn't have been no way to do so

8    because of the order from Judge Day of no contact, no third

9    party, no directly, indirectly.

10        THE COURT:  There's nothing in Judge Day's order that

11   would preclude anybody from calling any witness to the stand to

12   testify at trial.

13        THE DEFENDANT:  No.  I'm saying --

14        THE COURT:  And what witnesses are called at trial is a

15   trial strategy decision made by competent counsel.  I would,

16   quite frankly, think it would have been extremely prejudicial to

17   you to subpoena her on your behalf to testify for you, but no

18   subpoena was requested and no subpoena was issued.

19        THE DEFENDANT:  What I'm saying, sir, is when I asked

20   the attorney about it, because all through motions from the day

21   of arrest and all that, all was said was the daughter would be

22   here, the daughter is going to testify against the father, the

23   daughter is going to do this, the daughter is going to do that

24   -- even before I was given an order and having talked to my

25   daughter, you know, asking what was going to go on or whatever,

1    because we still trying to figure out exactly what was really

2    happening, but the government was basically like, no, I was

3    threatening her -- and I wasn't -- but the point being that I

4    thought that I was go be able to, you know, confront my accuser

5    or have some --

6            THE COURT:  You exercised and had the right to confront

7    all persons who testified in this case.  The government chose

8    not to have her testify.  They didn't have to have her testify.

9    If you wanted to have her testify, you could have had a subpoena

10   issued for her, she would have been brought here and required to

11   testify.

12           THE DEFENDANT:  My counsel said that they -- we started

13   trial I guess April 19th.  When I asked about it, he said he had

14   just found out that moment that that was the decision that was

15   made.

16           THE COURT:  What decision?

17           THE DEFENDANT:  That my daughter wouldn't be here for

18   trial, because I asked --

19           THE COURT:  The government can make a decision on who

20   it wants to call as witnesses and if you were counting on the

21   government to call somebody and you wanted to make certain that

22   the person was going to come, you'd issue your own subpoena.

23   That way it's not the government's decision, it's your decision

24   as to whether that person testifies or not.  The government

25   chose not to call her as a witness and the government has the

1  right to do that.  Now, if you wanted to have her testify, you

2  could have issued a subpoena for her.

3          But, also, you need to understand, the selection of

4  witnesses and whether to call witnesses is something that really

5  is largely committed to counsel, very competent counsel in this

6  case, and I suggest that in this case, knowing what I know about

7  it now that the trial is over, calling her to testify for you

8  would have been a very unwise decision for a defense attorney to

9  make.

10         So, your objection is overruled with respect to that

11  issue.  What's your next issue?

12         THE DEFENDANT:  Sorry, Your Honor.  I'm looking through

13  my paperwork because it was rearranged.

14         But my understanding, sir, was, you know, that I

15  supposed to, you know, deal with my attorney on all these bases

16  and I had in trying to subpoena my daughter, which you just

17  ruled on that, but he said he couldn't.  And so, that's why he

18  didn't.  And then, you know, all these things that I'm saying,

19  because you --

20         THE COURT:  I've already addressed the question of your

21  daughter testifying.  What is the next issue you'd like to

22  present in support of your motion for new trial?

23         THE DEFENDANT:  I'm trying to find the paper.  The

24  substantial step was one.

25         THE COURT:  Pardon me?

1          THE DEFENDANT:  Excuse me?

2          THE COURT:  Say it again.

3          THE DEFENDANT:  I guess it was substantial step was --

4          THE COURT:  What are you saying?

5          THE DEFENDANT:  Substantial step.

6          THE COURT:  I don't know what you mean.

7          MR. PROCTOR:  The elements of the offense, Your Honor,

8   requires a substantial step taken.

9          THE DEFENDANT:  I had them in order.  I just don't have

10  the paper.  I have it.  I'm sorry, Your Honor.

11          I'll try to go in order.  The next one was witnesses in

12  my favor.  I had gave him people that I wanted to have come for

13  me, like Ms. Corey Webster.  She had came to testify on my

14  behalf but the counsel had said no.  I had gave him other list

15  of people and he said no to those.  So, either they weren't

16  contacted --

17          THE COURT:  Well, your attorney has exercised sound

18  judgment and trial strategy in the selection of what witnesses

19  to testify.  He also has an obligation as an officer of the

20  court not to present testimony that would not be proper under

21  the rules of evidence.  Your counsel did a very good job for you

22  during this trial, made appropriate selections, and I don't

23  believe that there's anything I've seen that would be

24  inappropriate about his selection with regard to witnesses.

25          MR. PROCTOR:  And let me just add, Your Honor, as it

Case 8:10-cr-00654-RWT   Document 138   Filed 10/21/11   Page 9 of 63

9

1   may address Mr. Webster's concerns, at some point during the

2   trial I approached the bench ex parte and put on the record who

3   my client wanted me to call --

4           THE COURT:  Correct.

5           MR. PROCTOR:  -- and why I didn't call them.  So,

6   that's preserved for an appellate court to look at.

7           THE COURT:  All right.  Well, your objection is noted

8   on that.  It's been preserved during the course of the trial as

9   well as today.  So your motion with respect to that issue is

10  denied.  What was your next issue?

11          THE DEFENDANT:  See, you had asked Mr. Proctor to help

12  me with this May 17th, but I wasn't able to have that

13  opportunity.  So this is why it was done on my own and

14  submitted.  But he said rules of completeness, that because the

15  e-mails, letters and phone calls that pertain to myself and my

16  daughter, they only -- they redacted or edited or blackened out

17  or snipped --

18          THE COURT:  That's an issue that I've already addressed

19  during the course of the trial and I found the redactions to be

20  appropriate and I deny your motion for new trial on that basis.

21  But that issue is, of course, preserved for appeal.

22          THE DEFENDANT:  And one of the other arguments, we were

23  arguing when the government -- when the government was

24  addressing the jury and it was in reference to how this took

25  place or how it was adopted or adapted or how it came to be, it

Case 8.10-cr-00654-RWT  Document 138  Filed 10/21/11  Page 10 of 63

1    was all thrown on me and it was -- it was -- it wasn't -- it's

2    my fault as well as my daughter's fault.  It's our fault and I

3    never not took responsibility for it.  I take responsibility for

4    her actions as well.  But the way it was initiated and all, they

5    threw everything on me and, granted, I--

6              THE COURT:  Well, sir, the state of Maryland

7    legislature has made a decision that incest is a violation of

8    the criminal law.  It does not matter whether both people are

9    cheerfully, happily doing whatever they're doing, but it is

10   against the law, and when you make a communication that seeks to

11   induce someone to do something in violation of the law, that is

12   a crime, and it would not be proper to make an argument that

13   this was something that the victim in this case was willing to

14   do.  So, that's not a proper issue and your motion is denied

15   with respect to that issue.

16             THE DEFENDANT:  I thought this was -- this is what's

17   confusing me.  Everybody keep saying this is an incest case, but

18   I was told that this was a coercion, enticement case, but every

19   time I turn around, even though there's e-mails, letters and

20   phone calls, all I keep hearing is this an incest case, this is

21   an incest case in the state of Maryland.  These were

22   conversations that were immoral, true, because I was in Illinois

23   and she was in Maryland.  That's all they were.  But because

24   there was immoral conversations or immoral telephone calls or

25   communication and conversations that were immoral, I guess this

USCA4 Appeal: 16-9922    Doc: 6    Filed: 07/05/2016    Pg: 11 of 63
Case 8:10-cr-00654-RWT   Document 138   Filed 10/21/11   Page 11 of 63

11

1   where I get the substantial step or model penal code.

2          We said some things that weren't supposed to be said is

3   true and, again, I take responsibility for that because that is

4   my child, but where we get to this point of cohabitating in

5   Maryland or getting married in Maryland and all this, those did

6   not happen.

7          THE COURT:  All right, sir.  I'm going to overrule your

8   motion and deny it with respect to that issue.  The United

9   States Congress has made it a crime to use an interstate

10  communication facility, which means the Internet, the telephone

11  or the mails, to entice a minor to engage in a sexual activity

12  prohibited by law.  That is precisely what was presented to this

13  jury.  That's precisely what this jury found.  And I find no

14  basis to grant a new trial on that issue.  So what's your next

15  issue?

16         THE DEFENDANT:  I guess that's where I close with the

17  final part of this.  Enticement, coercion, persuasion,

18  inducement, those words I guess broken down, "coercion," like to

19  force, or "entice," to lure, or "persuade," like trickery or

20  whatever you call it and -- what was the other one --

21  "inducement" to -- it's like force also.  Those -- I understand

22  you keep saying the legislature says, but those words in their

23  basic meaning was not what was done and, as I keep saying, or

24  stressing the fact, these were mutual conversations.  I can't --

25  I can't say --

1          THE COURT:  All right, Mr. Kemache-Webster, I have

2    already heard your argument on this issue.  Unless you have any

3    additional issues, your motion is denied.

4          THE DEFENDANT:  I tried -- Your Honor, I just -- you

5    had ordered my counsel to assist me with this and that wasn't

6    done.  So that's why --

7          THE COURT:  Your counsel has done a very good job for

8    you that I personally observed and that objection is also

9    overruled.  All right.  Your motion is denied.

10          Now we're ready to proceed with sentencing.  Have both

11    parties had a chance to review the presentence report?

12          MS. FREITAS:  Yes, Your Honor.

13          THE COURT:  And you have, Mr. Proctor?

14          MR. PROCTOR:  Yes, sir.

15          THE COURT:  And your client has reviewed it?

16          MR. PROCTOR:  Yes.  We've gone through it more than

17    once.

18          THE COURT:  All right.  All right.  Are there any

19    factual disputes between the parties as to the content of the

20    presentence report?

21          MR. PROCTOR:  Guideline disputes or factual disputes?

22          THE COURT:  No.  Factual disputes.  I do note that

23    there's a number of things in the presentence report where

24    information by Mr. Kemache-Webster to the probation officer

25    turned out to be false.

1          MR. PROCTOR:  I would dispute that, Judge.  Not

2    verified is not the same as false.

3          THE COURT:  Well, saying he went to Georgetown

4    University Law Center, that's kind of bold.

5          MR. PROCTOR:  If I can approach, I'll be happy to show

6    you the certificate.

7          THE COURT:  You want to approach?  All right, you may.

8          Okay.  That's quite a bit different than being a

9    student there.  My daughter went to Georgetown Law Center and

10   taught the Street Law program at a local public school.  I know

11   what it's all about.

12         MS. FREITAS:  Your Honor, there are several factual

13   issues.  The government is going address those in our argument

14   for the obstruction of justice enhancement at that time, which I

15   believe Mr. Proctor has raised as an issue.

16         THE COURT:  Well, let's go through on the obstruction

17   question.  Let me go through the other aspects of the

18   presentence report.

19         The probation officer has recommended that I find the

20   offense level to be 36.  Now, let me go through the building

21   blocks of that number.  Is there any disagreement with respect

22   to the base offense level of 28?

23         MR. PROCTOR:  No, sir.

24         MS. FREITAS:  No, Your Honor.

25         THE COURT:  There is an enhancement of two levels

1    because the defendant was a relative of the victim.  Any

2    disagreement about that?

3              MR. PROCTOR:  No, sir.

4              MS. FREITAS:  No, sir.

5              THE COURT:  And then there's an enhancement for unduly

6    influencing a minor to engage in prohibitive sexual acts,

7    another two-level increase.  Any disagreement about that?

8              MR. PROCTOR:  No, sir.

9              MS. FREITAS:  No, Your Honor.

10             THE COURT:  Then there's another enhancement in

11   paragraph 13 of two levels because there was use of a computer.

12   Any disagreement about that adjustment?

13             MR. FREITAS:  No, Your Honor.

14             MR. PROCTOR:  No, sir.

15             THE COURT:  Then there is an adjustment in paragraph 16

16   for obstruction of justice and I believe that that is disputed;

17   is that correct?

18             MR. PROCTOR:  Yes.

19             THE COURT:  All right.  Let me go to the other aspects

20   of the report.  Then we'll come back to that.

21             The probation officer has assessed the defendant's

22   criminal history and has assessed the criminal history category

23   as being five.  Any disagreement about that?

24             MR. PROCTOR:  I would just note, Judge, that my client

25   advises me he has filed coram nobis as to paragraphs 43, I

1   believe, and 44, and those have not been ruled on and are

2   pending.  I know that's not a basis to postpone sentencing, but

3   at the moment it's still --

4           THE COURT:  Well, if it hasn't been granted, I'm going

5   to consider them.

6           MR. PROCTOR:  Correct.  It has not been granted.  But

7   we would, I guess, preserve to the extent any later coram nobis

8   under 2255 or Rule 60(b) to come back on that basis.

9           THE COURT:  All right.  Your objection is noted.

10          All right.  Then the central issue is on the

11  obstruction of justice, and I believe the government indicated

12  you wanted to make some presentation on that issue.

13          MS. FREITAS:  Yes, Your Honor.

14          THE COURT:  You may proceed.

15          MS. FREITAS:  Your Honor, the government believes the

16  obstruction of justice enhancement under 3C1.1 is applicable for

17  multiple reasons.  We address some of these issues in our

18  motion, but I want to highlight a few, Your Honor, that

19  demonstrate a pattern of obstruction from the onset of this

20  investigation through to sentencing.

21          Excuse me, Your Honor.  I'm having a sore throat today.

22          When the victim's mother brought the letters and

23  e-mails she found to the police in August of 2010, that's when

24  the investigation --

25          THE COURT:  Can you pull the mike a little closer?

16

1            MS. FREITAS:  Yes.  That's when the investigation -- I

2    apologize -- was initiated.  On September 14th Magistrate

3    Connelly signed a criminal complaint and arrest warrant, which

4    was served upon the defendant on September 15th.  I had sent

5    Your Honor yesterday or filed yesterday the report that was

6    completed by Postal Inspectors Kevin Gorham and Mark Hallisey

7    out in Illinois when they interviewed the defendant, and this is

8    where I want to start because the government contends this is

9    where the obstruction began and it does touch on one of the

10   enhancements.

11           Your Honor, the defendant told several lies throughout

12   this investigation to law enforcement.  He knew that there was

13   an investigation because he was advised of such.  He was

14   arrested via criminal complaint and he was told that by the

15   postal inspectors.

16           I want to touch first on page 3 of the report.  On page

17   3 of the report -- and I believe Your Honor has a copy.  So I'll

18   rely on that --

19           THE COURT:  Yes, I have it in front of me.

20           MS. FREITAS:  Okay.  The postal inspectors asked why

21   Mr. Webster discussed impregnating his daughter.  His response

22   was that he told investigators he meant that he would adopt her

23   child if she were to get pregnant.  This is completely

24   contradicted by his own previous letters to his daughter that

25   the government introduced during trial as Government Exhibit L-9

1   where he specifically states -- along with the purpose of the

2   October 10th date, which is also inquired of him by the postal

3   inspectors -- they not only asked him why he discussed getting

4   his daughter pregnant but what the significance of the October

5   10th date was and he responded to them that that date's

6   significance was he wanted to make it a special day because he

7   missed his daughter's birthday and that he would adopt any child

8   that she might have.  But a letter he wrote on July 29th says,

9   "Our agreed anniversary is Sunday, October 10, 2010, at 10 a.m.

10  Even though we will be doing it from my return home date until

11  forever, on Sunday 10-10-10 at 10, this date we will truly

12  celebrate all day.  I mean the entire day doing it.  So if you

13  are not pregnant before then, on that date it will be dedicated

14  to getting you to be for sure."

15         I hardly think that the reasons he had told

16  investigators for those statements he made that were presented

17  to him were accurate at all.

18         This was not the only time, however, Your Honor.  He

19  was also asked whether he had ever engaged in sexual activity

20  with his daughter before.  He was specifically asked this.  This

21  is on page 3 -- excuse me -- page 2 of the interview by the

22  postal inspectors.  He stated he had not.  Government's Exhibit

23  L-3, "I know that our love and intimacy has made a big

24  difference and concern in both of our lives and with all we have

25  done and gone through with each other, I think we've done pretty

1   good in nearly our two years together.  Think about what other

2   couples may have gone through or have dealt with and look where

3   we are in ours.  We are doing all right."

4          Postal Inspector Gorham showed Webster an e-mail dated

5   August 19th and asked him why he wrote using some vulgar words

6   I'm not going to say.  He responded they were in response to

7   questionnaires that Nikki sent.  The government introduced those

8   questionnaires at trial, Your Honor.  "What is your favorite

9   dish to eat?  The head rap for Muslim girls, can I get one?  Is

10  there anything I can do to continue to help you?  This is not a

11  question.  It's a comment.  You know I love you."  Again, Your

12  Honor, his responses were sexual in nature not because his

13  daughter asked for such but because he was furthering his

14  coercion and enticement.

15         But it didn't stop with the interview and his lying to

16  law enforcement officers.  He was indicted on October 25th of

17  2010.  On October 21st he placed a call to Nikki, and I'd like

18  to play this call at this time, Your Honor.  This was played in

19  court redacted as Government C-2.  However, the government

20  redacted out portions where the victim and the defendant

21  discussed the potential penalties.  We would like to play that

22  call unredacted because it is in context.

23         THE COURT:  You may.

24         (Recording played.)

25         MS. FREITAS:  On November 21st following that call,

1  Your Honor, Nikki contacted Postal Inspector Pickens and advised

2  that she felt threatened by her father and she no longer wanted

3  to communicate with him any more.  So, following that day I

4  filed a motion the next day for protective order and a hearing

5  was set for the 24th.  However, on November 23rd there was

6  another call to Nikki that I would like to play for the court at

7  this time.

8           THE COURT:  All right.  This is after the order?

9           MS. FREITAS:  It's after I filed the order, Your Honor,

10  but not after it was signed.  This is before it was signed.

11           THE COURT:  Okay.

12           (Recording played.)

13           MS. FREITAS:  On November 24th, the next day after that

14  call, in open court Magistrate Day signed the order and stated

15  in open court that he was not to contact or communicate with

16  Nikki either directly or indirectly.  His attorney could for

17  legal purposes.  That order was filed.

18           On December 2nd of 2010, at 4:14 p.m. the defendant

19  called Nikki's cell phone number.  This was testified to at

20  trial and evidence of that was provided pretrial to defense.

21  The call lasted nine seconds and the caller hung up.

22           On January 3rd of 2011, the defendant again called

23  Nikki's phone number from CTF at 3:01 p.m.  This call lasted 12

24  seconds and again it was a hang-up.  A third time on January 3rd

25  at 3:09 -- this was the third time total, not the third time on

1   January 3rd -- he called her cell phone again.  This call lasted

2   10 seconds.  We do have those calls, Your Honor, and they have

3   been provided to defense.  They are caller hang-ups.

4          On March 15th of 2011, the defendant -- and to be

5   clear, not Ms. Waters or Mr. Proctor but the defendant himself

6   wrote a letter addressed to my co-counsel, Ms. Belf, and in this

7   letter he requested a private meeting with the prosecutors and

8   his 16-year old daughter, outside of normal channels.  Your

9   Honor, for the record, that is in the letter.

10         Following the trial the defendant wrote two letters to

11  a government witness and the mother of the victim, Giselle

12  Morch.  The letter to Ms. Morch was postmarked May 3rd, the

13  first one, and it has on it a very interesting picture.  It's a

14  picture of the cover of what I believe to be a book or an audio

15  titled "Abigail and Leah Living In a Difficult Marriage."  The

16  irony of that is Ms. Morch and the defendant have been divorced

17  since 2003.  He wrote across the top "Please read."

18         The first line of this letter begins with him telling

19  Ms. Morch, "Do yourself and her and I both this favor."  It's

20  interesting to note throughout the letters, Your Honor, that he

21  refers not to himself singularly but to "Nikki and I."  He

22  presumes to speak for himself and his daughter.  Later on down

23  the page he says, "So, please explain to me how it was our

24  communications and conversations truly wrong if they kept her on

25  the right track until I returned home?  A mistake was made, a

1    human error.  God does not make mistakes.  This time you did."

2          He writes at the bottom of that first page, "P.S.  If

3    you can find it in your heart to visit me, please do so so we

4    can talk."

5          Page 3 of the letter he states, "Under the care and

6    guidance of our Lord and Savior."  The government finds this

7    ironic because the defendant is a Muslim.  While his religion is

8    irrelevant to this case, it was established through two

9    government exhibits, L-10 and BOP-3, that he is a Muslim.  He

10   told his daughter this several times throughout the letters.  He

11   registered this at the Bureau of Prisons.  Ms. Morch is a

12   devoted Christian.  He's using this to manipulate and influence

13   her during the course of the letters.  And this is not the only

14   time that this is stated.

15         The next page the defendant begins his campaign against

16   his daughter in an attempt to convince Ms. Morch that the victim

17   is somehow responsible for what happened.  I think we heard a

18   little bit of that belief that continues to persist in this

19   courtroom today.  He states, "We did not do anything wrong in

20   the way everyone has come to believe."  He goes on throughout

21   the letters making a variety of statements to that effect and

22   trying to, Your Honor, sway Ms. Morch into believing that her

23   daughter has done something wrong.  On page 3 of the letter,

24   "This has now been taken away, needlessly, destructively,

25   unwarrantedly, with complete devastation because of you and

1   others not asking and not knowing."  This is just a few things

2   in this letter.

3          And it's not the only letter he wrote to a government

4   witness, the victim's mother.  After trial he wrote a second

5   letter.  That letter is 44 pages long and dated May 7th.  Now,

6   it's not handwritten 44 pages, Your Honor, because what the

7   defendant did throughout the letter is he attached e-mails that

8   he received in preparation for trial, which, interestingly

9   enough, violated the discovery agreement that we made in court

10  stating that the defendant could have these items to take so

11  long as they were never provided to anyone else.  He provided

12  e-mails.  What's interesting is he highlighted all the portions

13  of the e-mails where he felt showed his daughter's culpability

14  in her own victimization in this case.

15         Following the receipt of these two letters, Ms. Morch

16  contacted the court and, as Your Honor recalls, we were brought

17  in here and another protective order was issued.

18         In the defendant's motion for a new trial which, again,

19  neither Mr. Proctor nor Ms. Waters wrote, the defendant wrote,

20  it's very interesting that the facts are completely distorted

21  about what occurred at trial, yet another attempt by the

22  defendant to sway and influence the outcome of this case.

23         But that's not where it ended.  He had a meeting for

24  the presentencing report with Mr. Lambert.  He contends -- the

25  defense contends in his sentencing memo that the information

1    provided to Mr. Lambert, even if it's false, is not material.

2    Unfortunately, both 3C1.1 and 3553(a) provide otherwise.

3    Application Note 4H of 3C1.1 articulates this as a reason for

4    the applicability of this enhancement.  Application Note 6

5    defines "materially false information" as information that, if

6    believed, would tend to influence or affect an issue under

7    determination.

8          3553(a) specifically provides that the court is to

9    consider the defendant's background and history as well as his

10   potential for recidivism.

11         The defendant lied on multiple occasions to

12   Mr. Lambert.  Let's start with his education.  First, he stated

13   he attended Gonzaga High School.  Gonzaga High School told

14   Mr. Lambert they have no records of the defendant ever

15   attending.

16         He then stated he attended Frostburg State University

17   from 1978 to 1981.  We have the request sent by Mr. Lambert to

18   Frostburg State University and, surprise, they have no record on

19   file.  It's important to note because, of course, it would be a

20   thought in all of our minds, that Mr. Lambert provided in

21   addition to the defendant's name, because we know he has about

22   49 aliases, his social security account number and his birthday

23   for them to check it against that.  Frostburg State University

24   provided that they have no record of him.

25         The odd thing, Your Honor, is that he told Mr. Lambert

1  that he attended Frostburg State University from 1978 to 1981

2  but he was in the military in Great Lakes, Illinois, from 1978

3  to December 1980.  I'm not exactly sure that preceding the

4  Internet how you can attend college in Maryland and serve in the

5  military in Illinois simultaneously.  Again, the military did

6  confirm that his service was not for the two-year period he

7  provided to Mr. Lambert.  We see in the military records that

8  his EOD, entry on duty, is October 2nd of 1978, and he was

9  discharged November 8th of 1978, less than a month later, not

10  the two-year span he provided Mr. Lambert.

11         He then went on to state, Your Honor, that he attended

12  University of North Florida where I believe he advised he had a

13  graduate degree in macroeconomics.  Here we have records from

14  University of North Florida.  Three names were provided as well

15  as his social, date of birth.  "No records found on given

16  information" for either his attendance or for a degree.

17         And, Your Honor, I will be making all of these records

18  as exhibits for the purposes of sentencing at the end of the

19  hearing.

20         And, finally, Your Honor, he stated he attended Norfolk

21  State University in Norfolk, Virginia.  Again, "Cannot locate

22  any record."

23         Your Honor, the government also provided a grand jury

24  subpoena to the Consumer Affairs Regulatory Office in

25  Washington, D.C. to obtain information on the two companies the

1   defendant stated he owned.  Washington Digital Communication

2   Services, we have received no information on that company at

3   all.  There was for the Metropolitan Private Detective Agency a

4   business statement of facts but nothing further on that

5   business.

6           Your Honor, the 3C1.1 enhancement is applied when a

7   defendant willfully obstructs or impedes or attempts to obstruct

8   or impede the administration of justice with respect to any

9   phase of the proceedings of his case.  An application note

10  covers a nonexhaustive list of ways in which an individual can

11  do that.  Mr. Webster hit about four of those, Your Honor.  He

12  attempted to unlawfully influence a witness or attempt to do so,

13  not just his daughter, the victim, but his ex-wife and a witness

14  for the government at trial, Ms. Morch.

15          Your Honor heard several of the over 200 calls made to

16  the defendant by Nikki and we hear how he's very controlling and

17  that influence he has on her life.  There were as many as six

18  calls a day.  You also heard some of the content of some of the

19  letters and the e-mails.  I think it's a fair statement that the

20  defendant's control of Nikki exceeded that of a normal parent.

21          It's the government's assertion that the three calls

22  made after the protective order in and of themselves constitute

23  a violation and warrant the obstruction enhancement on their

24  own.

25          In addition, it's also the government's assertion that

1    the letters sent to Ms. Morch were blatant attempts to influence

2    her and, through her, her daughter, and in and of themselves

3    constitute an obstruction that would warrant the enhancement.

4          However, I think we've seen a pattern throughout the

5    evidence that the government has presented.  We've got, A,

6    Application Note 4A, unlawfully influencing a witness; G,

7    providing false statements to a law enforcement officer; H,

8    providing materially false information to a probation officer in

9    respect to a presentencing report; and, J, failure to comply

10   with a restraining order or injunction.

11         The government has demonstrated a pattern.  The

12   defendant has attempted willfully and intentionally throughout

13   the course of this case to influence the outcome in any way

14   possible.  Asking to meet with the prosecutors and his daughter

15   whom he has a no contact order with outside the normal channels?

16         Your Honor, heard some of the things he said in the

17   calls.  "The people are telling you to do that, what they want

18   you to do, so you can go to court so I can get the time."

19         "They are trying to put by you, testifying against me,

20   saying that I did things to you, which I didn't do things."

21         This is a 16-year old child.  Even if it were an adult,

22   the case law that the government provided has found far less

23   instances where this obstruction enhancement applies than what

24   we have here today done by Mr. Webster.

25         From those letters, to lying to Mr. Lambert, we've

1   shown the defendant will, have and did, do and say anything he

2   could to try to influence the outcome of this case and he still

3   is today, and he does this to promote his inaccurate version of

4   the world for his self-preservation.  The courts have ruled in

5   these cases as to far less.  The defendant by his criminal

6   history is well versed in the criminal system.  These are no

7   accidents.  These are no "I didn't intend to," Your Honor.

8   These are willful attempts and they were calculated by the

9   defendant.

10          He has 14 separate convictions for fraud, not just

11  writing bad checks, fraud and fraudulent schemes.  The defendant

12  is fully aware of what he is doing.  His actions constitute the

13  very essence of obstruction, not just one incidence or two

14  incidences but multiple.  It's the government's assertion that

15  these acts taken individually and as a whole satisfy the

16  requirement and have met the requirement to have the 3C1.1

17  enhancement made applicable in this case.

18          THE COURT:  All right.  Mr. Proctor.

19          MR. PROCTOR:  May I have a moment?

20          THE COURT:  Yes.

21          MR. PROCTOR:  Judge, basically I would submit on my

22  pleadings, which I believe preserves the issue.  We don't

23  believe an obstruction enhancement is applicable in this case

24  and for that reason -- and I would note that Application Note 5B

25  says false statements to law enforcement are not covered or

28

1   "narrowly" is the word, something like that.  So, I don't

2   believe that's an applicable enhancement.

3          It's not atypical in my experience that 30-year old

4   college records don't show up.  So I don't believe Your Honor

5   can infer from that that he was somehow misleading in his

6   claiming to have those degrees and, frankly, Judge, when we get

7   to materiality, I would expect the court to consider someone

8   who's got multiple masters degrees not any more favorably than

9   someone who doesn't when fashioning a sentence.  I mean, is it

10  more excusable, less excusable if you're highly educated to do

11  what he's been convicted of?  I don't know the answer to that.

12         I would note that the phone calls the government claims

13  are a basis for an enhancement were never completed.  They were

14  a minute or seconds.  It says "Caller hang-up."  I don't know if

15  that means Mr. Webster hung up or Nikki hung up.  I don't know

16  the answer to that.

17         THE COURT:  Well, he initiated a phone call to her cell

18  phone number, right?

19         MR. PROCTOR:  Well --

20         THE COURT:  From jail.  I mean --

21         MR. PROCTOR:  We don't know that.

22         THE COURT:  -- that's been well documented.

23         MR. PROCTOR:  We don't know that.  We don't have a tape

24  of "You have a collect call from," click.  We don't know that.

25  We don't know if he absentmindedly dialed the numbers and hung

1   up once he realized who he was calling.  There's not enough to

2   infer from that that the obstruction of justice enhancement

3   applies.

4           When you listen to those phone calls -- and I would

5   note, Judge, there were more than 200 of them.  The government

6   cherry-picked a couple -- you know, "Tell them that you my

7   witness for your Mama to withdraw."  That's not "Lie for me,"

8   you know.  And it's Nikki who says, "I can write on the down

9   low.  What name would you like me to use?"  That's not the

10  defendant enticing obstruction of justice.

11          So, I think the horse is sufficiently flogged, Your

12  Honor.  I don't intend to argue any more.  I just don't believe

13  that this amounts to obstruction.

14          THE COURT:  All right.  I have considered the

15  presentation of the government and the argument of counsel and

16  conclude that the obstruction enhancement is richly deserved.

17  The panoply of actions taken by this defendant to obstruct

18  justice is impressive indeed and he acted in violation of an

19  order of Judge Day, added to what the government contended was

20  also when he sought to replace Mr. Proctor as his counsel and

21  get a third lawyer and was told no, he obstructed justice by

22  filing a frivolous bar counsel complaint, which I've already

23  written an opinion about, which is clearly obstructing the

24  proceedings in this court.  When a decision is made with respect

25  to counsel and he wants to second-guess it by filing a frivolous

1   bar complaint, that was met with a very strong response from me.

2   So I add to that to all the things that the prosecution has laid

3   out.

4        He repeatedly lied to investigators.  There's no way to

5   describe those phone calls to his daughter other than tampering

6   with a witness and acting later in violation of Judge Day's

7   order.  He lied repeatedly to Mr. Lambert.  And any one of these

8   alone would be sufficient for the obstruction enhancement and,

9   unfortunately, for me I looked at the guidelines and there's no

10  way to give multiple obstruction enhancements.

11       So, I find that this adjustment was richly and fully

12  warranted in this case and I will apply it.

13       That then brings us to the final application of the

14  sentencing guidelines and, as I indicated before, at offense

15  level 36 and criminal history category five which I'll be

16  utilizing, that provides for a guideline range of from 292 to

17  365 months, and I have now applied the guidelines, produced the

18  applicable range, and I'll be glad to hear from you,

19  Mr. Proctor, with regard to sentence.

20       MR. PROCTOR:  I believe the government has a

21  presentation and witnesses to call.

22       MS. FREITAS:  Your Honor, we have two victims who wish

23  to give statements.

24       THE COURT:  Oh, please.

25       MS. FREITAS:  Is this the appropriate time, Your Honor?

1          THE COURT:  Yes.  Go ahead.  I didn't realize you had

2   them here.

3          MS. FREITAS:  Yes, Your Honor.  I believe the victim in

4   the case, F.W., Nikki, would like to give a statement.

5          THE COURT:  All right.

6          MS. FREITAS:  I believe also for the record, Your Honor

7   has her four-page victim impact statement provided earlier by

8   the government.

9          THE COURT:  All right.

10          MS. FREITAS:  Are you F.W.?

11          F.W.:  Yes.

12          MS. FREITAS:  Okay.  Go ahead, Nikki.

13          F.W.:  First off, I would like to say even though Daddy

14   hurt --

15          THE COURT:  Could you put the mike there.  Thank you.

16          F.W.:  First off, I'd like to say even though Daddy

17   hurt me, I still love him.  I don't understand why he would lie

18   on me.  I was there for him a hundred percent.  Out of all his

19   kids, I was the only one that cared.  I did everything I could

20   for him.

21          I honestly don't like that he's still locked up and I

22   can't see him, but it's only for the better.  If I could tell

23   Daddy anything, I would say I love you.  No matter what your

24   name is and where you are, you'll still be known as Daddy to me.

25   You can change your name 49 more times, but you'll still be

1    known as my father.  I love you with all my heart and only wish

2    the best for you.  You are a very smart person.  You could have

3    gotten so far in life with no problems.  You made the wrong

4    choices and I'm sorry I took all your footsteps, but I'm

5    catching myself.  I remember when I wanted to be just like you,

6    but now that I see how fake you are, I really don't want to be

7    anything like you.

8            Daddy, I thought I had a parent that cared.  I guess --

9    well, I guess not.  Well, regardless, I will always love you and

10   I can't change the fact that you're my father.  I love you,

11   Daddy.  I got a tattoo in remembrance of you and now I regret

12   it.  Well, no matter what, you will never be forgotten.

13           THE COURT:  Thank you very much.

14           MS. FREITAS:  Your Honor, the mother of the victim

15   would like to give a brief statement.

16           THE COURT:  All right.

17           MS. FREITAS:  State your name.

18           MS. MORCH:  Good morning.  Giselle Morch.  Excuse me.

19   I'm sorry.  All I want to say is basically it's a hard struggle

20   because when you go to the mall and you see a father holding

21   their daughter's hand, you see what it's supposed to be like.

22   And when I entrusted Nikki, our daughter, to your care, I didn't

23   think that she would be harmed.  I didn't think that she would

24   now have to suffer emotional stress that is going to take a

25   while for her to recover.  But with God's love and his guidance,

1   we will get through this in the same way you will get through

2   it.  But just know that we forgive you and now you have to ask

3   God to forgive you.

4          And the last thing is, please, wherever you may be,

5   seek help, seek help so that you can be a better human being.

6   Thank you.

7          THE COURT:  Any additional matters from the government?

8          MS. FREITAS:  No, Your Honor.

9          THE COURT:  All right, Mr. Proctor, I'll be glad to

10  hear from you.

11         MR. PROCTOR:  Thank you, sir.  First of all, if I may

12  approach.  My client has some letters on his behalf and a

13  certificate of completion of a program from CCA, which I think

14  addresses Ms. Morch's seek help.  He has been seeking help.  And

15  we should probably mark these as Sentencing Exhibit 1, something

16  like that, Your Honor.

17         THE COURT:  Okay.

18         MR. PROCTOR:  A couple of those letters are from people

19  at the jail.  I think the court has seen enough sentencings to

20  know -- and I find it myself -- it's incredibly difficult to get

21  someone at a jail to write a letter, put themselves on the line

22  for an inmate.  So, the fact that two people did suggests he's

23  not a problem.  One of the letters references something like

24  he's one of the very few inmates I can recall that doesn't have

25  any disciplinary infractions, any problems.  This case

1   notwithstanding, he's not a management problem in jail and I

2   assume where he's going in the BOP he won't have anything like

3   the flexibility he had at Marion.

4           You know, there is no excusing this.  I put it in my

5   sentencing memo.  I'm not standing up today telling you anything

6   otherwise.  I would, however, note that there are -- I believe

7   the government's sentencing memo says 200 calls, 700 e-mails, 70

8   letters, and I've read every e-mail, I have read every letter,

9   and I have listened to every call.  Actually, I have it on my

10  iPhone.  Because there were so many of them, what I would do is

11  if I had to go see a guy in jail, I'd plug it in in the car and

12  I'd listen to Mr. Webster talking on the phone so that I had

13  something to do on the route.  So, I took trips to Cumberland.

14  I took trips to Hagerstown and I took trips to ECI and I

15  listened to him the whole way there and the whole way back

16  because it's hours and hours and hours.

17          And I guess my point is hundreds of them are regular

18  father-daughter conversations.  Many of them aren't.  And the

19  government cherry-picked, which is their right, and played them

20  for the court.  So, you know the bad, but you never got to hear

21  the good.  It's clear that this man cared deeply about his

22  daughter.  Was he misguided?  Did he say some horrible things?

23  Absolutely.  But there was a lot of good.  There was a lot of

24  caring about how she was doing in school, and is she going to

25  see the doctor, and what's life like where she's living.  You

35

1  know, there's always a yin to a yang I guess is my point.

2       So, as I put in my sentencing memorandum, a guideline

3  sentence is close to a life sentence at Mr. Webster's age and

4  while the government may dispute his educational background, I

5  don't think anyone here disputes he's in poor health as is

6  documented in the presentence report.  And so, when you're

7  fashioning a sentence, Judge -- and Miss Nikki -- I keep having

8  to catch myself from saying her name -- you know, if you read

9  her four-page letter, it's clear, you know, she doesn't want bad

10  things to happen to her dad.  That's not her call.  It's yours,

11  I agree, and she is but one component of what Your Honor must

12  factor into any decision.  But a life sentence means she'll

13  probably never see him again.  And if I read her letter, and I

14  don't mean to speak for her, she doesn't want that, and she

15  won't be a juvenile for very much longer.

16       And even the government makes a point about how he has

17  other kids.  The mandatory minimum in this case means they will

18  all be grown and gone by the time my client gets out of jail.

19       So, you know, I was thinking about this on the way down

20  here, Judge.  I must have had sentencings in front of a hundred

21  different judges.  I know -- and I'm not trying to butter you

22  up -- I've never seen a judge try harder to arrive at the

23  appropriate sentence than you have.  You agonize over it.  You

24  spend a lot of time thinking about it and the factors in it.

25  So, I'm not asking for any specific number because you've always

USCA4 Appeal: 16-9922   Doc: 6      Filed: 07/05/2016    Pg: 36 of 63
Case 8.10-cr-00654-RWT   Document 138   Filed 10/21/11   Page 36 of 63

36

1   looked like you're earnestly, steadfastly trying to arrive at

2   the right number all by yourself.  I would just point out a

3   guideline sentence is close to a life sentence.  It's not what

4   the victim wants.

5           And my client's record, while fraudulent -- it's

6   replete with fraud over decades, but nothing like this ever

7   happened before.  It's out of character.  And Dr. Lehne's letter

8   which I supplied suggests it's unlikely to be repeated, again,

9   which is not to excuse it, but I would ask that Your Honor

10  consider all of this when fashioning a sufficient but not

11  greater sentence, and with that I'll sit down.

12          THE COURT:  All right.  Would your client like to

13  address the court?  I'll be glad to hear from him.

14          MR. PROCTOR:  I believe he would.

15          Mr. Webster, if you could stand, please.  Judge, could

16  I just take a minute while the court -- there's a witness that

17  just arrived and I just want to speak to them.  I haven't had a

18  chance to yet.

19          THE COURT:  All right.  You may.

20          (Pause.)

21          MR. PROCTOR:  I'm sorry, Judge.  I have a witness.

22  Reverend Lloyd?

23          MRS. LLOYD:  Mrs. Lloyd.

24          MR. PROCTOR:  Mrs. Lloyd.  Is your husband the

25  reverend?

1           MS. LLOYD:  No.

2           MR. PROCTOR:  Okay.  Come on up.

3           THE COURT:  Have her step forward.

4           MR. PROCTOR:  Well, she'll tell you who she is.

5           MRS. LLOYD:  My father is the reverend.

6           MR. PROCTOR:  Oh, your father is the reverend.  And she

7    just arrived.  So, thank you for allowing me a few minutes to

8    speak to her.  She'd just like -- come right up here to the

9    microphone, ma'am.  This microphone is not too live.  So,

10   project your voice to Judge Titus.  Tell him your name, how you

11   know Mr. Webster and what you'd like him to know.

12          THE COURT:  Speak right into the mike.  Thank you.

13          MR. PROCTOR:  Good morning, and thank you for having

14   memo here this morning.  My name is Mrs. Lloyd and I work with

15   CTF where Mr. Webster is housed in the D.C. Jail and I have

16   worked with those two facilities for six years teaching life

17   skills.  My position is to teach the inmates good citizenship in

18   our life skills classes.  They have an opportunity to learn

19   domestic violence, anger management, peer mediation, conflict

20   resolution, communication, leadership skills and parenting.  And

21   those are what we have but they are not limited to other

22   services that we offer the inmates.

23          In the life skills class Mr. Webster is one of the

24   leaders in those classes.  And the parenting class, it was put

25   together -- my initiative but it was put together by the

1    inmates.  Mr. Webster and three other inmates got together and

2    put together the objective, the goals and the value system for

3    the parenting class.

4            Within the classes that we hold in our good citizen

5    classes, we also teach the inmates how to be good citizens and

6    leaders in their community.  Mr. Webster was the first host of

7    the town hall meeting and set the tone on how that town hall

8    meeting will flow.  Since then there has been town hall meetings

9    once a week, which Mr. Webster is the facilitator and makes sure

10   things are flowing well in those town hall meetings.

11           Mr. Webster has -- we have worked with Mr. Webster for

12   over three months now and what I see in Mr. Webster is someone

13   who cares about his family, someone who cares about parenting

14   with what he does within the parenting group.  He seemed to be a

15   good leader and he seemed to want to move forward in a better

16   way and to have his life have meaning to others and not just

17   merely those around him.

18           In the unit where he is there is a diverse group of

19   inmates.  We have folks from Africa.  We have folks from Europe,

20   African-Americans and Hispanic all in that one unit.  Prior to

21   the life skills class, they were just serving their time.  But

22   through the leadership class, they now have all come together

23   like a village concept, and he is one of those that will make

24   sure that the inmates who cannot speak English, that their

25   paperwork is well understood.  He gathered the inmates who are

1    bilingual to help those who cannot speak English.  Those who

2    speak French, he will find someone to make sure that they

3    understand what the court papers are.  Like yesterday we were in

4    the jail and he spent most of his time in the library helping

5    the inmates understand what the court papers are and making sure

6    that all the things were in order for court.

7            That's the Mr. Webster I know, and I know moving

8    forward he is ready to do better for his life and those outside

9    in the community.  Thank you for listening.

10           THE COURT:  Thank you very much, ma'am.

11           MR. PROCTOR:  Would you like to hear from Mr. Webster?

12           THE COURT:  Yes.

13           MR. PROCTOR:  Mr. Webster, if you can stand up, please.

14   If you would like to tell Judge Titus anything before he

15   sentences you, now is the time to do it.  If you don't wish to

16   tell him anything, he won't hold that against you.  But with

17   that said, what would you like to tell Judge Titus?

18           THE DEFENDANT:  What I did was wrong.  I'm so sorry.

19   My ex-wife, she did entrust my daughter as well as my other kids

20   with me.  I didn't get to really know the other two as well as

21   my daughter because we had so much time apart, like 11 years.

22           What happened with my daughter and I should not ever

23   have happened and I'm so sorry.  I have 14 kids and I've never

24   had no problems like this.  I don't know what happened.  She

25   doesn't know what happened.  And I take full responsibility for

1    that.  I take responsibility for my daughter because, one, she

2    is my daughter.  Even if she was 80 years old, she's still my

3    daughter and I will still take responsibility for her.

4         To my ex-wife, I'm so sorry, because as much as we been

5    through, I can understand, knowing you how I know you 30 years

6    now -- I've known her for 30 years because we used to go to

7    college -- I used to be her instructor in college, in Montgomery

8    College.  So I've known her for a long time.  I'm so sorry

9    because I know how you feeling inside per se because I know how

10   I'm feeling.

11        I still don't quite understand what all has happened

12   throughout our child and I'm still hoping that the help that you

13   want to seek for her does continue from where I had started and

14   you continue on, because she wants the help.

15        Nikki, Turtle, I never denied you as my child.  So,

16   don't never think that.  I know the DNA thing came about, but

17   that was something the courts had came with.  I didn't never

18   deny you as my child.  I never would.  I never lied on you.  I

19   did try to cover for us, me, what we did.  We had discussed it

20   so much that we knew we were wrong and we didn't think it would

21   go no further than just us.  Don't feel bad for what's happening

22   to me because I was the parent and I knew better.

23        I don't want you getting in no more trouble.  I know

24   you always hear that you just like your daddy, you look just

25   like your daddy, you act just like your daddy.  A lot of daddy

1   is good.  A lot -- some things that he's done is bad.  Don't

2   believe that you have to just be like daddy and keep getting in

3   trouble.  No more trouble.  No more -- don't do it, please.  Now

4   you can see what can happen.

5           Again, as my family, I go to God, Allah, every day

6   asking for forgiveness, and this is the first time that I have

7   been able in front of everybody say what happened was wrong, not

8   just the e-mails, letters and phone calls, our actions, my

9   actions.  Even if it didn't seem like you were being tooken

10  (sic) advantage of, the bottom line is I'm the father, I'm the

11  parent, and I'm wrong.  I'm grateful that you've forgiven me

12  because I don't deserve it.

13          Giselle, take care of our kids properly.  Don't just

14  let somebody else keep doing the arguments we have over.  Step

15  up more.

16          Your Honor, in closing, my daughter, she had gave me

17  this little poem and I wholeheartedly believe it.  She said she

18  "asked myself if I'm go be like my daddy.  Why does he lie so

19  much?  Will I be just like him?  Will I grow up to be just like

20  him or even worse?  Why did my father do what he did?  He really

21  hurt me.  I am not sure if he knows that.  I would do anything

22  to have him in my life.  I feel like it's my fault."

23          Nikki, it's not your fault.  Not at all.  Turtle, it is

24  not your fault.  Granted, only between you and me, we'll know

25  everything that really happened.  Regardless, it is not your

1    fault.  I'm the parent.  I'm the father.  I'm the daddy.

2        Just going through the rest of it without going through

3    all of it, Your Honor, she does have some problems going on and

4    I did help work through them.  I really did.  All my letters,

5    calls and e-mails weren't bad like that.  They weren't.  She was

6    having a lot of things and I did try to help.  I really tried.

7    And I tried to give as much guidance as I could from a thousand

8    miles a way, but there is some things in there that's like

9    you're not the boss of me, you're not the charge of me, because

10   it's hard to do from that far away, which is true, but I did

11   what I could during my time at Marion.  While we were home, it

12   was no problems, no troubles, no nothing, just inappropriate

13   behavior between her and I.  Myself the cause.  There is no

14   excuse.  No excuse.

15       I don't know all she's going through now.  I know what

16   she was going through before and my understanding is that

17   because she's so angry because I'm gone that it's escalated.

18   She didn't know me before we came together.  Last time she saw

19   me she was three.  Next time she saw me she was 14, turning 15.

20   Now she's 17.  The last time I saw her she was 16.

21       It's nothing else that troubles me more than to know

22   that she could fall through the cracks if she doesn't

23   understand.  I'm sure she does now because it's the first time

24   she ever seen something like this really go on.  And all I want

25   to say is whatever the state of Maryland, the government or

43

1   whoever can do to help her, please do so.

2           And, Nikki, you getting the help, please continue to

3   look over your sister and brother as you have done since you

4   were three.  Look over them, especially Giana.  Don't let her

5   fall through the cracks at all.  Don't let her emulate things

6   that you were doing.  And stop doing the things that you are now

7   doing, and we both know what those are.  I'm speaking to you as

8   a father, not as your friend, not as your lover, not as your

9   boyfriend, as your father.  All the things I taught you, follow

10  through with them.

11          Giana, listen to your sister.  Giselle, all I say to

12  you other than I'm so sorry, is please, please take the time to

13  listen to Nikki.  She has a lot to tell you.  Just listen.

14  That's why she misses me so.  I took the time to listen.  I say

15  it and I say it and I say it, don't enforce.  Endorse.  Meaning

16  don't keep pressuring her, putting her on the early, making her

17  get the point whereas W.I.F. and things of that nature.  Pay

18  attention to her, because it's really important now.  She's

19  about to turn 18 soon.  She needs that trust now more than any.

20  So, please listen to her.  Don't assume.  Ask.

21          Nikki, choose your friends more wisely.  This is your

22  father talking.  This is daddy.  Listen to what I say, please.

23  Just trust your gut, not the things that you think but the

24  things that you know.  No more trees and rolling.  Yes, I know.

25  No more daiquiris.  Yes, I know.  Just slow down.

1          I'm sorry, both of y'all, and I love you.  Again, Your

2   Honor, I'm so sorry.  That's all.

3          THE COURT:  Thank you.  All right, government.

4          MS. FREITAS:  Yes, Your Honor.  Your Honor, the

5   government is seeking the high end of the guideline range, a

6   365-month sentence.  This coercion and enticement by the

7   defendant is a very practiced art.  He spent his life honing his

8   craft and when he had perfected it, he used it in a despicable

9   manner, on his own child.

10          When he was in front of the Honorable Judge Mott in

11  Superior Court in the District of Columbia being sentenced in a

12  bad check charge, Judge Mott said to him, "I think when I look

13  at this record and I hear you talk in front of me, a number of

14  words come to mind:  Manipulative, deceitful, irresponsible, and

15  obviously criminal.  And you've got to get it through in your

16  head that this is the way you've lived your life for over most

17  of the last 20 to 30 years or there are going to be other

18  victims in the future when you get out of prison and you have

19  only yourself to blame for your choices."

20          Judge Mott had it exactly right, Your Honor.  What's

21  interesting is that the defendant stood here and stated he was

22  an instructor for his ex-wife.  She just informed us that is not

23  correct.  The defendant's lies continue.

24          There's an interesting Washington Post article that the

25  defendant was interviewed for about how great of a father he

1    was.  He discussed how wonderful he was to his children.  This

2    was during the period of time where he was raping his 14-year

3    old daughter.

4            The ability to lie and manipulate is something the

5    defendant has had a pattern of, and the defense's own expert,

6    Dr. Lehne, stated that the defendant tends to "present himself

7    in a positive, self-justifying way" and is "not necessarily a

8    reliable informant," which is a very nice, polite way of saying

9    he's a liar.

10           The court pursuant to 3553(a), one, is to consider the

11   history and characteristics of the defendant.  So I want to talk

12   briefly about that history.  Up on the overhead, Your Honor, is

13   a very, very blurry exhibit.  This is the defendant's birth

14   certificate.  I put this up because there's so much confusion

15   about the defendant's name and that's led to a lot of other

16   issues.  He was born Brian, B-r-i-a-n, Webster, and shortly

17   after his birth that name was changed to B-r-y-a-n Kenooch

18   Webster.  That's the defendant's legal name and we see his

19   birthday is September 28th of 1960.  Now, somewhere along the

20   line, not in Gonzaga High School like the defendant reported,

21   but in the D.C. public school system we've got his name now

22   coming in -- it's very hard to see this because it's an older

23   record -- as B-r-y-a-n-n Kenooch Webster, VI.  So, already in

24   high school we're working on our future criminal acts.

25           His marriage certificate, which I will get back to in

1    just a moment, his marriage certificate, Your Honor, is very

2    interesting.  We have a driver's license that can't possibly be

3    real because, A, it doesn't have his real name; B, it makes him

4    nine years younger and he's now the eighth.  I guess we've

5    progressed from the sixth to the eighth.  He also states he's

6    born in France, which is pretty challenging when you've been

7    born in the District of Columbia.

8         On his own daughter's birth certificate, for one of his

9    children he cares so much about, he again lies.  This is a legal

10   document that his daughter needs to use for her identification

11   and her future, and he states he's again the eighth with yet a

12   different name and he was born in France.

13        I think perhaps, Your Honor, we see why in later

14   records -- this would explain why we have 49 different aliases

15   for the defendant, different versions of his name.  When the

16   government asserts that his manipulation and deception is a

17   practiced art, there really is an extent to it.  He's got about

18   nine social security numbers and a whole lot of birthdays, most

19   that make him younger.

20        He does, in fact, have 14 prior convictions, but there

21   are far more arrests, Your Honor, that are not convictions that

22   document his life of crime over the years.

23        He has 14 living children, but the government could not

24   find one ounce of proof he has ever supported them financially.

25   We had agents track down many of those children.  Most did not

1    know him, never met him, didn't know who he was.  So when I hear

2    these arguments about how he cares, he's a caring father, it's

3    just not anything that can ever be established.  He hasn't been

4    in most of his children's lives throughout any length of time.

5          And that's a brief history, but that brings us up to

6    some characteristics of the case.  We know the victim in this

7    case was 14 when, after not seeing her father for years and

8    growing up without a dad, she moved in with her dad.  According

9    to her victim impact statement, "He started touching me

10   inappropriately in a way a boyfriend would touch a girlfriend.

11   He put his penis inside my vagina and in my mouth."

12         MR. PROCTOR:  Judge, to the extent that's a separate

13   crime and it's not charged in this case, I would object to Your

14   Honor considering it.

15         THE COURT:  It's related.  I can consider it.  It's

16   related conduct.

17         MR. PROCTOR:  If the government believes it happened,

18   they should charge him wherever it happened and he should face

19   trial for that.

20         THE COURT:  I understand.  You may proceed.

21         MS. FREITAS:  Thank you.  He "tried to put it in her

22   butt" but that never happened.  "He kept me home from school and

23   I only attended 50 of the 180 days of the school year."  This is

24   not a caring parent who cares about her education and her

25   welfare.  If we do the math, she basically had to endure this

48

1   for one year and five months.  And, according to her victim pact

2   statement, when she said no, he said "Stop it."  He would keep

3   going.  He would hit her and say "Shut up.  I'll give you

4   something to cry about."

5            When he went to Marion, his control over her continued.

6            (Recording played.)

7            MS. FREITAS:  This is one of those calls, Your Honor,

8   the government didn't cherry-pick.  This is one of those normal

9   father-daughter calls that exists and took place between the

10  defendant and his daughter during his time at Marion.  Your

11  Honor saw that there were far more calls.  And Mr. Proctor is

12  absolutely correct.  The government did select certain ones.  We

13  certainly, Your Honor, did not select just the ones with sexual

14  content.  We suggested a portion of those with sexual content.

15  Many of the calls were like this one, these normal conversations

16  between a father and daughter.

17           We can't forget that the defendant mailed his scent,

18  his scent on a piece of tissue, to his own child.

19           But what's worse, Your Honor, is over that period of

20  time he made Nikki a necessary part of his life.  He manipulated

21  her into serving as a spouse would.  He asked her to do things

22  that an adult would do for him.  He made her responsible or made

23  her feel responsible for his well-being while he was in jail,

24  for his future, even his legal issues.  He had her deposit money

25  in his jail account, deal with the storage of his possessions,

1   his Jeep, contacting his attorneys.  This is a child, his

2   daughter, not his spouse.  And these things were done to control

3   Nikki, to coerce and entice her, to dominate every aspect of her

4   life.  He told her what doctors to go to, whom she could date,

5   who not to date, where she could go and who she could go with,

6   all from prison.

7           Would you play the second call.

8           (Recording played.)

9           MS. FREITAS:  It's like husband and wife.  That's

10  simply unacceptable.  There was far more than a substantial step

11  taken here.

12          3553(a)(2)(A), the sentence must provide for the

13  seriousness of the offense, to promote respect for the law, and

14  provide the proper just punishment.  The defendant raped his

15  child and then maintained his relationship from prison in order

16  to have a life with her outside of jail.  That included vaginal,

17  anal, oral sex and impregnating his own child.

18          I don't think there's any need to explain how serious

19  this offense is much further and I frankly don't think there's

20  any punishment that's ever going to deter the defendant or teach

21  him due respect for law.  If the previous 14 convictions and

22  dozens of arrests did not do that, a light sentence is not going

23  to do that here.

24          When I read the victim impact statement, Your Honor, I

25  think the saddest thing is the impact it's had on his daughter.

1    When she talks, she talks about what happened, but she talks

2    more about the fact that this was her father that did it.  He

3    was supposed to be her protector and her parent.  She blames

4    herself for his incarceration, and she does that in part because

5    the defendant insists, up until about five minutes ago, that it

6    was actually her fault.  In his motion argument for trial

7    earlier today, he stated she's partly responsible, she bears

8    responsibility.  She's contemplated suicide and engaged in self-

9    destructive behaviors not because she's like her father, because

10   she isn't, but because of what her father did to her.  She cries

11   a lot and feels sorry for him.  It's this level of coercion and

12   enticement that allowed him to be able to persuade her those six

13   months while he was in jail.

14          3553(a)(2)(C) addresses protecting the public.  When

15   you listen to the calls from the date of Webster's incarceration

16   to the end, you can hear how Nikki's voice changes, especially

17   when her father is not going to get out of jail in September.

18   She becomes bolder and less fearful.

19          It's interesting to note that Dr. Lehne's analysis

20   about the defendant included the statement, and I quote, "The

21   harm that incest offenders perpetrate is primarily upon their

22   children and family."

23          The defendant has another teenage daughter who is in

24   fact Nikki's younger sister.  Even more than that, he's obsessed

25   with Nikki.  Dr. Lehne stated in his own analysis, "I find him

1    to be highly anxious with a dependent personality style.  He is

2    much more sexually obsessed with his teenage daughter than is

3    typically found."

4            The public, particularly Webster's daughters and their

5    children one day, could be protected only by a lengthy sentence.

6    The coercion and enticement in this case was very severe and it

7    was so because he didn't initiate a relationship with a stranger

8    or try to groom a child he met on the Internet.  He furthered an

9    existing incestuous relationship.  His sexual discussions were

10   part of that, but his other discussions were part of that as

11   well.  That constant communication furthered his hold he had on

12   his child.

13           I find it interesting that the defense argues his

14   health should be taken into consideration.  Apparently he's so

15   ill that a long sentence would not be fair.  The defendant

16   wasn't feeling too bad when he told his daughter they'd be

17   having sex all day in that July 27th letter or when he discussed

18   his health with his daughter in a jail call.

19           (Recording played.)

20           MS. FREITAS:  The defendant never took into account the

21   physical or mental health of his daughter when he instructed her

22   in Government's Exhibit L-1 entered at trial quite in detail how

23   to stretch her anus in preparation for having anal sex when he

24   returned home, telling her on the third page of that letter to

25   "get a nice thick carrot or small size cucumber and make sure it

1    has plenty of Vaseline on it and use it only.  You will be ready

2    by the time the real thing comes."

3           He also wasn't too concerned, Your Honor, about his

4    health when he asked his daughter some questions in a letter

5    before he was coming home, which was introduced as Government's

6    L-9 during trial.  "If you had to have any special and freaky

7    sexual experiences, where would you have it and why?  What are

8    your top 10 sexual positions?  What is the worst thing you want

9    done to you by me?  Have you ever taken part in an orgy?  If

10   not, why?"

11          Certainly, Your Honor, I don't think any of these

12   questions for future acts he was planning on doing when he got

13   out represents a man who's not healthy.  I certainly think if

14   he's healthy enough to plan for anal sex, orgies and sex with

15   his daughter until he gets her pregnant, he'll do just fine with

16   365 months in jail.

17          Your Honor, there's so much evidence the court has seen

18   throughout this case to reflect the heinousness of what the

19   defendant did and, quite frankly, I don't believe anything the

20   defendant says.  I don't believe he's sorry.  He's exhibited a

21   pattern of lies and manipulation throughout his life.  When he

22   exercised that on his daughter, he wasn't writing a bad check or

23   committing a fraudulent scheme.  He was taking away his

24   daughter's futures and hopes.  This crime has had a tremendous

25   impact on her and her family.  It absolutely affects her.

1         In the words of his daughter, who is perhaps one of the

2    brightest teenagers I've met, she said, "You would think any

3    good father would try to protect their child.  Not my father.

4    Daddy was my hero until he did what he did.  Then he wanted to

5    put the blame all on me.  I'm always crying and there are so

6    many days like today when I just want to kill myself."

7         Three-hundred-sixty-five months is not just

8    appropriate, it's justice, Your Honor.  Thank you.

9         THE COURT:  All right.

10        All right.  The defendant comes before me for

11   sentencing today after having been found guilty in a jury trial

12   of a single count of use of an interstate commerce facility to

13   entice a minor to engage in sexual activity in violation of

14   Section 2422(b) of Title 18, United States Code.  That is very

15   dry clinical language and doesn't really capture the essence of

16   how unbelievable this crime was and it's hard to know where to

17   begin with regard to pronouncing sentence in this case.

18        The sentencing guidelines have produced a range of 292

19   to 365 months and the question that I must address now is

20   whether that sentencing range is sufficient but not greater than

21   necessary to meet the purposes of sentencing set forth in

22   Section 3553(a)(2) of Title 18 of the United States Code, and

23   application of the guidelines, as counsel are aware, is the

24   beginning, not the ending point of the analysis.

25        And let me now address the 3553 factors.  I have

1   already mentioned that the nature of this offense is difficult

2   to fathom how serious it is and I don't think the defendant has

3   the slightest perception of how serious this crime is and how

4   much damage that it's caused.  It is really one of the worst

5   crimes I have seen as a judge.

6           The history and characteristics of this defendant are

7   that he is an unrepentant con artist who has now committed one

8   of the worst crimes that has come to my attention of having a

9   sexual relationship with a child and in using interstate

10  facilities to try to entice a resumption of that from the

11  Marion, Illinois, prison.

12          Now, in imposing a sentence I'm required to consider

13  the seriousness of the offense and I've already indicated this

14  is perhaps the most serious that I have ever seen in terms of a

15  horrific offense and I'm required to and will provide just

16  punishment for it.

17          A sentence is required to promote respect for the law

18  and afford adequate deterrence.  This defendant has thus far in

19  his long criminal history not been deterred and shown no respect

20  for the law over his long checkered criminal history that's in

21  front of me today.

22          I'm required to consider the need to protect the public

23  from further crimes of the defendant, and the only way to do

24  that is to keep this gentleman incarcerated for a long, long,

25  long, long, time.

1          I'm required to consider the need to provide him with

2     needed educational or vocational training, medical care or other

3     correctional treatment in the most effective manner, and the

4     only place that that can be done appropriately is in an

5     incarcerated setting.

6          I'm required to consider the kinds of sentences

7     available, and the only type that's appropriate in this case is

8     incarceration.

9          I'm required to consider the need to avoid unwarranted

10    sentence disparities among defendants with similar records who

11    have been found guilty of similar conduct and that, of course,

12    is one of the principal functions of the guidelines and they

13    have produced a very significant sentencing range that is as

14    high as 365 months.

15          Finally, I'm required to consider the need to provide

16    restitution to any victims of the offense.  I would not even

17    know where to begin in determining appropriate restitution in a

18    case like this.  This gentleman has caused incalculable damage

19    to his daughter, absolutely incalculable.  It is going to be

20    quite difficult for this young lady to have a normal future life

21    and have a normal relationship with a man with this history

22    lurking in her background and haunting her.  I'm hoping that she

23    will get every type of therapeutic device and treatment that can

24    be afforded to her so that she can recover from the horrible

25    crime that her father committed upon her and which he sought to

1   entice her to resume upon his release from the Marion, Illinois,

2   federal prison.

3           So, as I said, I'm hard pressed to even think how to

4   fashion a restitution order if I were to do one.  Unfortunately,

5   this defendant is not going to be in a position to pay anybody

6   any money at all and I'm not going to therefore explore

7   restitution because I think it would be a meaningless gesture.

8           Suffice it to say that he has caused incalculable harm,

9   and it's really difficult to comprehend that this was a crime

10  committed from a comfortable jail cell in Marion, Illinois, and

11  I just am appalled that he was able to do that while

12  incarcerated.

13          I have to fashion a sentence that, as I said, meets the

14  guidelines set forth in Section 3553(a)(2) for a sentence and

15  look at this sentence and determine whether this would be

16  appropriate.  First, I've already indicated I struggled with the

17  fact that the obstruction of justice enhancement is only two

18  levels no matter how many things he does, no matter how

19  persistently he does it, and if there were anything to be done

20  to those guidelines to fix them for the Sentencing Commission,

21  it would be if somebody does a great multitude of things to

22  obstruct justice, they should not only be facing a two-level

23  enhancement.  I think the guidelines are sufficiently -- they're

24  deficient in that respect.  As I said, this defendant has been a

25  con artist.  He's tried to con this court.  He tried to con the

1  probation officer.  He's tried to gain the system.  He's tried

2  to defeat the system.  He's tried to -- he's violated multiple

3  orders of magistrate judges of this court, including Judge Day,

4  including Judge Connelly, who told him he was not going to be

5  getting a third lawyer and instead of accepting that decision,

6  which was richly and properly made and deserved, he did the most

7  hideous thing imaginable in filing a frivolous bar complaint.

8        So, as I said, I'm very troubled that in spite of all

9  the numerous things as laid out in front of me by Ms. Freitas,

10 only two levels for obstruction of justice in this case is

11 woefully less than what these guidelines should apply, and I

12 conclude that a guideline sentence in this case is not

13 sufficient to meet the factors set forth in Section 3553 and I'm

14 therefore going to impose a variance sentence of life

15 imprisonment.

16        I would note that if these guidelines did not have what

17 I consider to be a defect on multiple obstructions, it could

18 have been bumped up four more levels and that would put him in a

19 sentencing range that would be recommending life in any event.

20 This gentleman should not see the light of day ever again.  I

21 can never -- he has lied, cheated, stolen and committed the most

22 hideous possible crime against a member of his own family, and

23 under those circumstances I consider any sentence less than life

24 to be inadequate.

25        Frankly, though, 365 months would be, in effect, a life

1  sentence anyway, but I just don't want to get into a debate

2  about application of the guidelines in this case.  I think the

3  guidelines are high but they're not high enough.  This gentlemen

4  should not be on the street ever again.

5       I'm going to recommend to the Bureau of Prisons in the

6  strongest possible terms that he be incarcerated in one of the

7  two communication management units that the Bureau of Prisons

8  maintains in Marion, Illinois, and Terre Haute, Indiana, and in

9  light of his prior experience at Marion, it would perhaps be

10  better if he went to Terre Haute in the communication management

11  unit, which is a unit where another defendant has been placed

12  that Ms. Belf and I know very much about.

13       I will urge that the Bureau of Prisons preclude him

14  from any communication with his daughter.  I just don't see how

15  that could do anything other than to continue to inflict damage

16  on her.  Her relationship with her father is shattered by what

17  he did and I just don't think that any further communication

18  between him and his daughter is appropriate.  That is not

19  something I can order.  I can certainly recommend that to the

20  Bureau of Prisons.  But certainly he should be placed under at

21  least the minimal standards of the communications management

22  unit, which requires that all communications of any nature

23  whatsoever be reviewed and that he not be permitted to send out

24  any further communications of the nature that caused him to be

25  in front of me facing life in prison.

1          Should the defendant ever be released from prison for

2    whatever reason, I will place him on a period of supervised

3    release of life.  I will require that he will comply with the

4    mandatory and standard conditions of supervision with the

5    additional provisions that he register with the state sex

6    offender registration agency in any state where he resides, is

7    employed, carries on a vocation, or is a student, that he

8    participate satisfactorily in a mental health treatment program,

9    that he have no contact with the victim in this case, and that

10   he pay the special assessment of $100 if he's not previously

11   paid it.

12          I will not impose any fine in light of the defendant's

13   financial circumstances and I will impose the mandatory special

14   assessment of $100.

15          I want to advise the defendant of his right to appeal.

16   You have a right to appeal your conviction and sentence to the

17   United States Court of Appeals for the Fourth Circuit.  If you

18   wish to do so, you must do so within 14 days of today's date.

19   If you're unable to pay the filing fee for the appeal, there are

20   procedures that Mr. Proctor or the clerk of the court can

21   explain to you to have that fee waived, but if you wish to

22   appeal, you must do so if at all within 14 days of today's date.

23          Do you understand that, Mr. Kemache-Webster?  I didn't

24   hear you, sir.

25          THE DEFENDANT:  Yes.

1            THE COURT:  Mr. Proctor, I couldn't hear his response.

2            MR. PROCTOR:  He said yes.

3            THE COURT:  He said yes.  All right.

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  All right.  Anything further?

6            MR. PROCTOR:  Yes.  Briefly, Judge.  I didn't want to

7    interrupt you.  First of all, I told Mr. Webster and I'll say it

8    in open court, I will file the notice of appeal.  I don't

9    believe I'll be representing him because one of the issues

10   counsel may want to take up is the bar complaint.

11           THE COURT:  That's correct.

12           MR. PROCTOR:  But I will file the notice of appeal and

13   make sure it's docketed in the Fourth Circuit and seek my

14   withdrawal there.

15           Second of all, I object to the extent the court

16   considered the bar complaint in any way, shape or form.  One,

17   it re-raises the issue of whether I should withdraw and, two,

18   attorney grievance is there for a reason.  People have a right

19   to go.  It has nothing to do with an ongoing proceeding and I

20   don't believe you can use that to vary up in a sentence.  So, I

21   object to Your Honor considering the bar complaint in any way in

22   fashioning the sentence.

23           THE COURT:  Mr. Proctor, just to save you time, I don't

24   agree with you, but the bar complaint was the last on a very

25   large pile of things that I considered to be obstruction of

Case 8:10-cr-00654-RWT   Document 138   Filed 10/21/11   Page 61 of 63

61

1   justice and it had very little influence on my decision.  I

2   think it was richly deserved by those phone calls that I heard

3   and all the other things that I've chronicled and the violations

4   of the orders of Judge Day.  I don't rely in any significant way

5   on that, but I did condemn it in the strongest possible terms as

6   I said so in my written opinion.

7          MR. PROCTOR:  And, lastly, Judge, I object to not

8   receiving notice from the court that you had intended to vary

9   up.

10          THE COURT:  There's no requirement in the law for

11   notification of a variance, only a departure.  The Supreme Court

12   has already ruled on that issue.

13          MR. PROCTOR:  And I wanted to preserve it in case

14   something shakes up.  Thank you.

15          MS. FREITAS:  Your Honor, Ms. Morch has requested that

16   a no contact order extend to herself as well as the victim in

17   this case for Mr. Webster from prison.

18          THE COURT:  All right.  I'll add that to both

19   supervised release and the recommendation to the Bureau of

20   Prisons.

21          MS. FREITAS:  And the government is also inquiring is

22   that whether -- if the pending coram nobis is granted, would the

23   sentence be the same from the court?

24          THE COURT:  No matter what errors there may have been

25   in my calculation of the guidelines, I am simply declaring that

1   I consider a variant sentence to be the minimum that would be

2   appropriate in this case and whether the offense level is two or

3   90, I would reach the exact same sentence.  The guidelines

4   simply don't sufficiently punish the crime in this case because

5   of the enormity of all the various things he did.  So, this is a

6   variant sentence, not a guideline sentence, and while I have

7   applied the guidelines that I'm required to, I consider that

8   range, even if it were lower, to be insufficient punishment in

9   this case.

10        MS. FREITAS:  Thank you, Your Honor.  And the

11   government will be entering into evidence Exhibits 2 and 3,

12   which encompass the records the government presented and the

13   three CTF calls.  Thank you.

14        THE COURT:  All right.  They will be received.

15        MR. PROCTOR:  Judge, Mr. Webster is requesting that he

16   receive copies of his certificates back so he can take them with

17   him to jail.

18        THE COURT:  Certainly.  We'll make copies and give them

19   back to him.

20        MR. PROCTOR:  I think he wants the originals.  Right?

21        THE COURT:  We'll make copies of them for the record so

22   the record will be complete as to what he submitted today and

23   we'll return the originals to him.

24        MR. PROCTOR:  Thank you, sir.

25        THE COURT:  All right.  Thank you.

1          (Proceedings adjourned at 11:05 a.m.)

2               <u>CERTIFICATE OF REPORTER</u>

3          I hereby certify that the foregoing is a true and

4    accurate transcript of proceedings in the above-entitled matter,

5    to the best of my knowledge and ability.

6

7

8                              <u>            /s/              </u>
                               Gloria I. Williams
9                              Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25